
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 14, 2016

**STATE OF TENNESSEE v. IOKA KIMBUKE KYLES**

**Appeal from the Criminal Court for Davidson County**
**No. 2013-D-3323     J. Randall Wyatt, Jr., Judge**

_____

**No. M2016-00796-CCA-R3-CD**

_____

The Defendant, Ioka Kimbuke Kyles, entered guilty pleas in the Davidson County Criminal Court to two counts of facilitation of aggravated child abuse and one count of facilitation of aggravated child neglect. The trial court imposed concurrent eight-year sentences for each count, to be served in confinement. On appeal, the Defendant argues that the trial court erred in denying alternative sentencing. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR. and J. ROSS DYER, JJ., joined.

Nicholas McGregor, Nashville, Tennessee, for the Defendant-Appellant, Ioka Kumbuke Kyles.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; Glenn R. Funk, District Attorney General; and Jennifer Smith, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

On December 2, 2013, the Defendant and her co-defendant, Thomas Antonio Ricketts, were indicted for six counts of aggravated child abuse and one count of aggravated child neglect. The Defendant entered guilty pleas to the lesser charges of facilitation of aggravated child abuse in counts one and five and facilitation of aggravated child neglect in count seven, with counts two, three, four, and six to be dismissed pursuant to the plea agreement. The Defendant also agreed to be sentenced as a Range I, Standard Offender, with a range of eight to twelve years for each conviction and with all counts to run concurrently, leaving length and manner of service of her sentence to be

determined by the trial court. At the guilty plea hearing, the State summarized the facts surrounding the offenses as follows:

Your honor, the proof would show in this case that on July 18, 2013, the victim, who was 7-years-old at the time, was admitted to Vanderbilt Children's Hospital with pain to his right arm. The doctors determined that he had a spiral fracture to that arm. It was also discovered that he had numerous bruises, abrasions, marks, scars, all over his entire body including pattern marks on his back.

The victim's weight was also severely low and he was in less than the third percentile of his age. Both defendants were interviewed. Both defendants admitted to the time frame when the victim was in their exclusive care and it was determined that the acute injuries that the victim had would have had to have occurred while he was in the defendants' care.

However, some of the older healing injuries could have been the result of something that might have happened by the biological mother. Both defendants stated that the victim's arm was broken as the result of another sibling stepping on his arm. However, the Vanderbilt Care Team stated that this was not consistent with this type of fracture and all of the markings on the victim's body were a concern for abuse.

When confronted with the marks on the victim, the defendants first stated that the victim scratches himself and throws himself into a dresser when he is in the corner during time-out. When confronted with the markings that were all over the victim, they then stated that this was the result of a peanut butter allergy.

The victim was interviewed by several people. Initially, he stated that his arm was broke because he slept on it wrong; and then he stated that his arm was broke because a sibling stepped on it; and then he stated that the marks on his body were the result of a peanut butter allergy. However, he later stated that it was both of the defendants that twisted his arm that caused his broken arm. He told the forensic interviewer that both defendants beat him with whips and switches all over his body.

He told the forensic interviewer that he was made to stand in the corner all day without bathroom breaks and that when he peed on himself he would get punished. He told the forensic interviewer that he was denied food as punishment.

- 2 -

The roommate at the time, Jimmy Young, was interviewed by the police and he told the police that he heard the victim being spanked, for peeing on himself, during one specific time approximately 15 to 20 times with a belt, when he entered the room he saw defendant Kyles holding the victim down on the bed while defendant Ricketts was beating him with the victim's face in the mattress. Mr. Young told the police that the victim was beat every single day. Mr. Young told the police that the victim was made to stand in the corner from when he got up in the morning until night time. He told the police that the victim was deprived food and water and he was the only child that was not allowed outside to play with the other kids.

The neighbor, Mr. Stephen Willis, was also interviewed. He told the police that he saw the victim standing in the corner all day in his underwear. At one point, he saw the victim standing in the corner in his own filth and he also stated that at one point the roommate, Jimmy Young, came over to his house and was in tears because of how the victim had been treated.

All of this occurred here in Davidson County and based upon these facts the State recommends the previously announced disposition.

The trial court accepted the Defendant's guilty pleas and set the matter for sentencing.

**Sentencing Hearing.** At the March 31, 2016 sentencing hearing, the Defendant's presentence report was introduced without objection. The Defendant's criminal history included two convictions for possession of drugs and one conviction for filing a false report.

Detective Kenney, a detective with the Youth Services division, testified that he began an investigation of the Defendant and her co-defendant, Thomas Antonio Ricketts, in July 2013 after the victim was admitted to the hospital for arm pain. The victim's arm had a lateral condyle fracture, which commonly results from the arm being grabbed and forcibly pulled toward the center of the body. The examination also revealed that the victim had fresh and healing marks, scars, and lesions covering his face, neck, shoulders, back, hips, buttocks, groin area, and legs. Detective Kenney identified multiple photographs of the victim taken at the hospital on the day he was admitted and these photographs were introduced as an exhibit. The victim was also diagnosed with a "failure to thrive" because he was underweight and his weight had decreased since his last hospital visit one year prior.

- 3 -

The victim initially told hospital staff that he had injured his arm by sleeping on it wrong. The victim was then interviewed at the hospital by Department of Children's Services ("DCS") and he disclosed that the Defendant had injured his arm by grabbing it and twisting it. Detective Kenney testified that the victim "indicated that if he had to tell the truth again that he would get beaten." Detective Kenney interviewed the victim at the hospital and recalled that he was "very distraught, very withdrawn, almost terrified."

Detective Kenney testified that the victim was later interviewed at the Children's Advocacy Center where he told the forensic interviewer that Ricketts had caused his arm injury. The victim also told the forensic interviewer that Ricketts and the Defendant would force him to stand in a corner facing the wall for extended periods of time as punishment for wetting himself and that if he left the corner or had an accident he would be beaten. Detective Kenney took photographs of the corner where the victim was forced to stand, and the photographs were admitted at the hearing. Detective Kenney testified that the victim also told the forensic interviewer that he was often beaten by hand or with a belt and was denied food and water while the other kids in the house played outside. The victim told the interviewer that he was the only child in the household who received physical discipline.

Detective Kenney explained that, at the time of the incident, the victim was living with his father, Thomas Antonio Ricketts, and the Defendant, Ricketts' girlfriend. Also living in the home were Ricketts' other minor son and a roommate, Jimmy Young. Detective Kenney testified that the victim was originally in his mother's custody but was removed by DCS in 2012 due to truancy issues and "lack of stable housing and environmental concerns." The victim was then placed in the custody of his grandmother, Ricketts' mother, Thelma Pinkerton. In May 2013, Ricketts and Pinkerton agreed that the victim and his brother would live with Ricketts during the summer. Pinkerton told Detective Kenney that, when the victim went to live with Ricketts in May 2013, he had no visible injuries other than minor scratches and a burn mark that had possibly occurred while he was in his mother's care.

Detective Kenney interviewed the Defendant twice. The Defendant told Detective Kenney that the victim's arm injury occurred when his siblings jumped on him. The Defendant initially denied knowledge of any injuries to the victim's back but, after seeing photographs of the marks, claimed that the victim had an allergic reaction. After being confronted with more photographs of the victim's injuries, the Defendant then claimed that she had noticed the marks after the victim spent time with his mother in July 2013. The Defendant acknowledged that she punished the victim by putting him in the corner but claimed it was only for a maximum of thirty minutes. Detective Kenney testified that the Defendant had five children who were not living in the home and that DCS removed the Defendant's children from her custody in 2012 due to her drug use.

Jimmy Young testified that Ricketts and the Defendant lived with him for about a year in 2013. Young confirmed that the victim and six or seven other children lived in the house during the summer of 2013. Young recalled seeing Ricketts beat the victim with a belt while the Defendant held him down and the other children watched. Young also confirmed that the victim was sometimes forced to stand in the corner all day. Young testified that the victim was allowed outside on the porch but was not allowed to play with the other children.

Stephen Willis testified that Ricketts and the Defendant lived next door to him. Willis recalled observing the victim standing in the bedroom with his nose in the corner. Willis testified that the victim was alone in the house wearing only soiled underwear. Willis offered the victim food and water, but the victim refused and said "[t]hey will hurt me." Willis testified that he observed this on at least four or five separate occasions over a two-week period.

The victim testified but could not recall the time around when his arm was broken or earlier statements that he had made. The State introduced a recording of the forensic interview, which the trial court later reviewed when taking the Defendant's sentencing under advisement.

Meela Kyles, the Defendant's mother, testified that her daughter has five sons and that two were in Kyles' custody while the others lived with their father. Kyles testified that she never saw any injuries on the Defendant's children. On cross-examination, Kyles acknowledged that the Defendant did not have custody of her children before her arrest either. She also acknowledged that there were allegations that the Defendant had used drugs. Kyles was unaware of the Defendant's prior convictions and of the specific allegations against the Defendant in this case.

The Defendant's thirteen-year-old son, K.R., testified that he wanted his mother to come home and that she was a good mother who never hurt or injured him or his four brothers. K.R. testified that he had played with the victim and his brother before and had never seen any violence against them. K.R. read letters that he and his brothers wrote to the court asking for their mother to come home.

The Defendant made an allocution and requested release so that she could finish school, work, and help raise her sons. The Defendant also described multiple programs she finished and certificates she earned while in jail. After hearing the proof and arguments from counsel, the trial court took the matter under advisement to determine the appropriate length and manner of service for the Defendant's three convictions.

On April 14, 2016, the trial court entered an order sentencing the Defendant to concurrent eight-year sentences in confinement. It is from this order that the Defendant now timely appeals.

## ANALYSIS

On appeal, the Defendant only contests the manner of service of her sentence and argues that the trial court erred by denying her request for an alternative sentence. The State responds that the trial court considered the relevant factors and imposed a sentence consistent with the purposes and principles of the Sentencing Act. We agree.

"[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). Because the record shows that the trial court carefully considered the evidence, the enhancement and mitigating factors, and the purposes and principles of sentencing prior to imposing a sentence of eight years, the Defendant has failed "to either establish an abuse of discretion or otherwise overcome the presumption of reasonableness afforded sentences which reflect a proper application of the purposes and principles of our statutory scheme." Id. at 280.

Any sentence that does not involve complete confinement is an alternative sentence. See generally State v. Fields, 40 S.W.3d 435 (Tenn. 2001). In determining whether to deny alternative sentencing and impose a sentence of total confinement, the trial court should consider whether:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(A)-(C); see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

A defendant is eligible for probation if the actual sentence imposed upon the defendant is ten years or less and the offense for which the defendant is sentenced is not specifically excluded by statute. See T.C.A. § 40-35-303(a). An especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary. Id. § 40-35-102(6)(A). However, a trial court "shall consider, but is not bound by, the advisory sentencing guideline" in section 40-35-102(6)(A). Id. § 40-35-102(6)(D). Despite a defendant's eligibility, he or she is not automatically entitled to probation as a matter of law. Id. § 40-35-303(b), Sentencing Comm'n Cmts. Moreover, the defendant bears the burden of establishing her suitability for probation. Id. § 40-35-303(b). "[A] trial court's decision to grant or deny probation will not be invalidated unless the trial court wholly departed from the relevant statutory considerations in reaching its determination." State v. Kyto Sihapanya, No. W2012-00716-SC-R11-CD, 2014 WL 2466054, at *3 (Tenn. 2014).

As an initial matter, because the Defendant was convicted of three Class B felonies, she is not considered a favorable candidate for alternative sentencing. See T.C.A. § 40-35-102(6)(A). Additionally, the Defendant's contention that the trial court did not consider the three factors in Tennessee Code Annotated section 40-35-103(1)(A)-(C) is without merit. The trial court found that the Defendant's criminal history of three prior misdemeanor convictions, although not extensive, was relevant. The trial court also found that the offense was particularly serious because, "[n]ot only was the child repeatedly physically abused and even had his arm twisted so hard that it fractured, but both the Defendant and the co-defendant, Thomas Ricketts, forced the victim to stand with his face in the corner of their bedroom for entire days on multiple occasions." The court also found that the Defendant treated the victim with exceptional cruelty and that the victim's injuries were particularly great and likely to affect the victim "long into adulthood." Additionally, the trial court expressed interest "in the general deterrence effect that this sentence should have."

Although the trial court did not include an analysis of whether less restrictive means have been applied in the past, defense counsel stated at the sentencing hearing that the Defendant had never been on probation before and provided no further information regarding the manner of service of her previous convictions.[1] The record shows that the court properly relied on the Defendant's criminal history, the seriousness of the offense, and general deterrence in denying alternative sentencing. As such, we conclude that the

---

[1] The Defendant attempts to rely on information regarding her prior misdemeanor sentences in her brief that was not included in the record on appeal. However, this court cannot consider facts not established in the trial court or set forth in the record. See Tenn. R. App. P. 13(c).

- 7 -

Defendant has failed to prove that the trial court abused its discretion in denying an alternative sentence.

## **CONCLUSION**

Upon review of the record, we affirm the trial court's judgment.

               _____

               CAMILLE R. McMULLEN, JUDGE